UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TROY SHAFER, | : |
| Plaintiff, | : |
| vs. | : |
| INDEPENDENCE COMMUNITY BANK CORP., RICHARD MATCHINGER, and GARY HONSTEDT, | : November 21, 2005 |
| Defendants. | : |

## COMPLAINT

Plaintiff Troy Shafer, by and through her undersigned counsel, as and for her Complaint against Defendants Independence Community Bank Corp. ("Independence"), Richard Matchinger, and Gary Honstedt, alleges as follows:

### NATURE OF CLAIM

1.  This is an action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, NY Human Rights Law §290, *et seq.*, and NYCCHR § 8-101, *et seq.*, for discrimination in employment based on sex.

2.  Defendants discriminated against plaintiff Ms. Shafer by denying her the same opportunities for advancement as male employees who were less qualified, by creating a hostile work environment that changed the terms and conditions of her employment, and by retaliating against her when she

complained about defendants' discriminatory actions.

## PARTIES

3.      Plaintiff Troy Shafer is a citizen and resident of the State of Florida. At the time of the events complained of herein, she was a citizen and resident of the State of New York.

4.      Plaintiff is female.

5.      Upon information and belief, defendant Independence Community Bank Corp. ("Independence") is a corporation duly organized and existing under the laws of the State of Delaware. Its principal place of business is located at 195 Montague St., Brooklyn, New York.

6.      Upon information and belief, defendant Richard Matchinger is and was a resident of New Jersey at all relevant times.

7.      At all relevant times, defendant Richard Matchinger was First Vice President, Construction, of Independence and was acting within the scope of his employment and for the benefit of his employer, and as an agent of defendant Independence.

8.      Upon information and belief, defendant Gary Honstedt is and was a resident of New York at all relevant times.

9.      At all relevant times, defendant Gary Honstedt was Executive Vice President, Commercial Real Estate, of Independence and was acting within the scope of his employment and for the benefit of his employer, and as an agent of

defendant Independence.

10. Upon information and belief, at all relevant times, defendant Independence employed more than 500 people.

## JURISDICTION

11. Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) and pendant claim jurisdiction over the state law claims raised herein. Venue is established in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PROCEDURAL REQUIREMENTS

12. On or about November 3, 2003, within 300 days of at least one of the acts of which she complains, Plaintiff filed charges of employment discrimination with the Equal Employment Opportunity Commission against defendant Independence.

13. On May 5, 2005, the Equal Employment Opportunity Commission issued a determination in which it made a finding of sex discrimination, hostile work environment, and retaliation.

14. On or about August 13, 2005, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission with respect to such charges of discrimination, which notice was dated August 9,, 2005.

15.     Plaintiff has filed this Complaint within 90 days of receiving the Notice of Right to Sue.

## FACTUAL BACKGROUND

16.     Plaintiff Ms. Shafer was hired by Independence in April 2002 to work in its Manhattan office as a Senior Credit Analyst in Independence's Business Banking division.  As a senior credit analyst, Ms. Shafer was responsible for underwriting all real estate financings in Manhattan.  That position included the potential for managing a team of junior credit analysts as the department expanded.  At all relevant times, Ms. Shafer was employed in the Manhattan office.

17.     Ms. Shafer arrived at Independence with more than 10 years of experience in the commercial real estate lending markets, much of it in Florida, and with excellent references.

18.     Ms. Shafer was hired as a Vice President of Independence.

17.     Other Vice Presidents, and even some employees in positions junior to Ms. Shafer's, worked from large executive offices at Independence's Manhattan office.

18.     At the time Ms. Shafer was hired, several large executive offices were vacant in the Manhattan office.

19.     Despite these vacancies, Ms. Shafer was told to work from a secretary's cubicle.

20.     Ms. Shafer was deeply humiliated by this "office" assignment.

21.     Many of Ms. Shafer's clients as well as other customers assumed Ms. Shafer was a secretary or receptionist when they viewed her at her workstation.  Ms. Shafer was so embarrassed by the arrangement that she made a practice of temporarily using one of the vacant executive offices when a client or customer came in to meet with her.

22.     Ms. Shafer protested to her manager, defendant Brenden Sachtjen, about the location of her office.  She was told that the Facilities Department simply would not move her into any of the vacant offices.

23.      This situation continued for eight months, at which point Independence responded to Ms. Shafer's complaints by moving her into a makeshift office.  Men at the same level as Ms. Shafer, including those who were hired after her, all occupied large, senior executive offices

24.     Further, in June 2002, Ms. Shafer was asked to make the after-hours recording for the office phone.  When she protested, she was told to be a "team player" and do it.  She did, and customers and clients often recognized her voice and questioned why her voice was on the recording in the role of a receptionist.

25.     On January 21, 2003, Ms. Shafer received her first performance review from Independence.  In it, Ms. Shafer's performance was rated as "outstanding";"; her many contributions to Independence were highlighted;; she

was described as a leader.  In January 2004 Independence again rated Ms. Shafer's performance as outstanding through aa second performance evaluation.

      26.    At or about this time, the bank restructured and Ms. Shafer was assigned to Independence's Construction Loan Department ("CLD") as a construction loan underwriter.

      27.    The construction loan underwriter position was a function junior to that of Senior Credit Analyst.  It was thus a demotion for Ms. Shafer.

      28.    In her new position, Ms. Shafer reported to defendant Richard Matchinger.

      29.    Ms. Shafer reported to Mr. Matchinger from on or about January 2003 until she left the bank in or around February 2004.  During this time, Mr. Matchinger made almost daily inappropriate comments.  Mr. Matchinger routinely made comments such as:

          a.    Commenting that his wife's favorite "position" was "with her head in my lap";

          b.    Commenting that he would never be able to report to a woman;

          c.    Stating that he is a charter member of the "He-Man Woman Hater's Club";

          d.    Exhorting Ms. Shafer to "be a man";

These are just a few examples of the numerous demeaningdemeaning comments that Ms. Shafer was forced by Mr. Matchinger to endure regularly.

30. Mr. Matchinger also made frequent derogatory comments about other women to Ms. Shafer. He would , commenting on their age, their appearance, how pregnancy affected their appearance, and other personal matters. Ms. Shafer also witnessed numerous other discriminatory comments made to women throughout Independence by its male executives.

31. In the face of these comments, Ms. Shafer remained as professional as possible.

32. At the time of the restructuring, Ms. Shafer was not approached about opportunities in the Commercial Real Estate division, the area in which she has the most experience and expertise.

33. Upon inquiring about such opportunities, Ms. Shafer was informed that John Costa, head of that department, needed time to set up the structure of the department before hiring additional staff. However, at the time of the restructuring, Mr. Costa hired other male employees of Independence with less skill and experience than Ms. Shafer.

34. In March 2003, Mr. Costa arranged to interview Ms. Shafer about an opportunity in the Commercial Real Estate department. However, when Ms. Shafer asked about the specifics of the position, none were given, and it appeared it would be yet another demotion. Both Gary Honstedt and Mr. Costa

became irritated with Ms. Shafer when she asked about the title, salary, bonus, and benefits.

35.   Mr. Costa then cancelled Ms. Shafer's interview with a Senior Credit Officer in connection with the purported position and told Ms. Shafer that she was making "a big deal with all of the questions."  No offer was ever made to Ms. Shafer for a position in the Commercial Real Estate division.

36.   Thereafter, Mr. Costa was extremely hostile to Ms. Shafer, and often hung up the telephone on her, ignored her e-mails, and failed to return her phone calls regarding deals that her unit and the Commercial Real Estate division were working on together.

37.   Upon information and belief, during her employment at Independence, Ms. Shafer was not paid comparably to male employees in similar positions.

38.   Upon information and belief, during her employment at Independence, Ms. Shafer was not paid comparably to male employees of similar experience, skill, and qualification.

39.   In July 2003, Independence announced that it was opening a real estate lending office in Boca Raton, Florida.  Ms. Shafer was extremely interested as much of her experience was in the Florida real estate market.

40.   When she expressed interest in managing the Florida office, she was informed that Independence already had someone in mind for the position.

41. Upon information and belief, Independence did not have anyone designated to manage the Florida office at the time that Ms. Shafer inquired.

42. Independence did not consider Ms. Shafer for the Florida management position because she is female.

43. Upon information and belief, the first Independence employee to be offered the post of managing the Boca Raton office declined the offer.

44. Although Ms. Shafer again expressed interest in the management position, once again she was not considered because she is female.

45. Ms. Shafer then applied for an underwriting position in the Florida office.

46. Although she is more than qualified for that position, Ms. Shafer was not seriously considered for the underwriting position in the Florida office because she is female.

47. Despite Ms. Shafer's dogged attempts at pursuing a position in Florida, her many voice mails and telephone calls over a three-month period went unanswered.

48. Ms. Shafer was counseled by Mr. Matchinger not to follow up with an e-mail regarding the Florida underwriter position because the recipient did not like assertive women.

49. In July and August 2003, Mr. Matchinger further humiliated Ms. Shafer by insisting that she commute four hours a day to Newark, New Jersey,

in order to sit at his desk while he was on vacation, although there was no reason for her to do so.

50. Upon arrival in Mr. Matchinger's office, Ms. Shafer observed a chalk board that said "Troy's Word of the Day  Day  Frou Frou."

51. While in the Newark, New Jersey office, Ms. Shafer was subject to and witnessed a work environment that was replete with sexual innuendo and was hostile to women. Upon information and belief, much of the hostile environment was created and/or condoned by Peter Kenny, a Senior Vice President of Independence.

52. Upon her return from the Newark, New Jersey office, Ms. Shafer complained about the instances of sex discrimination and sexual harassment complained of herein to the head of Independence's Human Resources department.

53. Ms. Shafer's complaint was not acted upon by Human Resources.

54. However, certain employees did become aware of Ms. Shafer's complaints.

55. Thereafter, Ms. Shafer was assigned fewer and fewer loans to underwrite and was often idle. Both Mr. Matchinger and other members of Independence's management were overtly hostile to Ms. Shafer.

56. Following her complaint, Mr. Matchinger frequently subtly encouraged Ms. Shafer to quit.

57. With very little work being assigned to her and clearly no career opportunities available to her, as well as the intolerably hostile work environment, Ms. Shafer had no choice but to seek other employment and leave Independence.

58. The employment Ms. Shafer accepted upon leaving Independence was inferior in salary, benefits, and stock options to that which she would have had at Independence had she not been discriminated against.

<u>First Cause of Action:</u>   42 U.S.C. 2000e, *et seq.*
*Against Independence Community Bank Corp.*
.

59. Plaintiff repeats and realleges paragraphs 1 through 58 as if fully set forth herein.

60. Plaintiff was denied promotions and the opportunity to apply for other positions at Independence because of her sex.

61. Plaintiff was demoted because of her sex.

62. Plaintiff was given fewer attractive work assignments than men of equivalent of inferior experience because of her sex.

63. Plaintiff endured harassing remarks and actions from co-workers and superiors which were directed to her because of her sex and which created a hostile working environment.

64. The sexual harassment suffered by plaintiff altered the terms and conditions of her employment.

65. Plaintiff complained about sex discrimination and sexual harassment to her employer.

66. Plaintiff's employer took no corrective action in response to her complaint.

67. Defendants retaliated against plaintiff following her complaints.

68. Defendant Independence thereby violated Title VII, 42 U.S.C. § 2000e, *et seq.*

69. Plaintiff suffered emotional suffering and distress, and suffered monetary damage.

*Second Cause of Action:*  Violation of New York Human Rights Law
McKinney's Executive Law § 290
*Against all defendants*

70. Plaintiff repeats and realleges paragraphs 1 through 69 as if fully set forth herein.

71. By reason of the foregoing conduct, defendants violated § 290 of the New York Human Rights Law.

72. By engaging in the above-described conduct and by virtue of their positions in the bank, defendants Honstedt and Matchinger aided and abetted the sex discrimination against plaintiff.

73. By reason thereof, plaintiff suffered emotional suffering and distress, and monetary damage.

*Third Cause of Action:*   Violation of NYCCHR § 8-101, *et seq.*
                            Against all defendants

74. Plaintiff repeats and realleges paragraphs 1-73 as if fully set forth herein.

75. By reason of the foregoing conduct, defendants violated New York City Human Rights Code § 8-101, *et seq.*.

76. By engaging in the above-described conduct and by virtue of their positions in the bank, defendants Honstedt and Matchinger aided and abetted the sex discrimination against plaintiff.

77. Defendants' violations of the New York City Human Rights Code were willful.

78. By reason thereof, plaintiff suffered emotional suffering and distress, and monetary damage.

WHEREFORE, Plaintiff prays for the following relief:

1. Compensatory damages, including front and back pay;

2. Punitive damages, pursuant to NYCCHR § 8-101, *et seq.*;

3. Attorney fees;

4. Costs; and

5. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

The plaintiff hereby demands a jury trial as to all issues.

PLAINTIFF TROY SHAFER


By: S/Meredith C. Braxton
Meredith C. Braxton
Meredith C. Braxton, Esq., LLC
270 Greenwich Avenue
Greenwich, CT 06830
(203) 661-4610
Her Attorney